# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 1427 | **DATE** | 12/10/2004 |
| **CASE TITLE** | Marseilles Hydro Power, LLC, vs. Marseilles Land and Water Corp., et al., | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Plaintiff is entitled to take by eminent domain the Subject Property of Defendant as articulated in Section I(D). Defendants retain ownership of the two buildings situated on the Subject Property. Plaintiff shall pay Defendant just compensation for the taking in the amount of $168,750. Plaintiff is instructed to prepare a judgment order in accordance with the memorandum opinion and order. Plaintiff to submit said order to the court with a courtesy copy to chambers no later than Friday, December 17, 2004.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | *3* | **Document Number** |
| ✓ | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 1 3 2004 | |
| | Notified counsel by telephone. | | date docketed | *80* |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | *12/10/04* | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| WAP | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

DEC 1 0 2004

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

MARSEILLES HYDRO POWER, LLC,

Plaintiff,

v.

MARSEILLES LAND AND WATER
CORP., et al.,

Defendants.

Case No. 04 C 1427

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

This is a condemnation case. The Plaintiff Marseilles Hydro Power, LLC (hereinafter, "Plaintiff"), owns a license to build and operate a hydroelectric plant to be located adjacent to the Illinois River in Marseilles, Illinois. The Defendant Marseilles Land and Water Company (hereinafter, "Defendant"), owns a canal, or raceway, that was used to power a hydroelectric plant that had previously been located at the site of Plaintiff's license. Contracts between the parties' predecessors (the "Indentures") require Defendant to keep the raceway in good repair. Plaintiff initially filed suit to enforce Defendant's obligations to put the canal in good repair. After Defendant continued to refuse to repair the raceway, Plaintiff filed suit to enforce the Indentures and commenced this eminent domain action. Defendant disputes the Plaintiff's ability to take its property by eminent domain. Defendant also argues, and sought to prove at trial, that Plaintiff need not take all of the land requested, and asserts that the value

of the land and water rights is $4,400,000. Plaintiff argues, and sought to prove at trial, that it is entitled to take all land and water rights described herein, and assert that the value of the taking is only $40,000. For the following reasons, the Court concludes that Plaintiff is entitled to take by eminent domain the property and water rights relating to the north and south head races and the canal walls, but not two buildings located on Main Street. The Court concludes that the total value of the property condemned is $168,750.

## I. **FINDINGS OF FACT**

### A. **The Property**

Plaintiff seeks to condemn approximately 13.76 acres of Defendant's property located near the Illinois River, consisting of seven land parcels. Of the 13.76 total acres, only approximately 1.4 acres are above water. The property has north and south channels, which flow into what are known as the north head race (the "North Race") and south head race (the "South Race") (collectively, the "Races"). The North Race is in major disrepair and has been dewatered. The South Race has not been dewatered.

On the property, the Army Corps of Engineers ("Army Corps") owns, operates, and maintains a dam, which is located on the Illinois River, a navigable waterway of the United States, in the City of Marseilles, La Salle County, Illinois (the "Dam"). The Army Corps also owns two intake gates on the property that regulate

water flow to the channels and Races (the "Gates"). Defendant operates the Gates, but does not have an ownership interest in the Gates. In addition to the water-related areas, there are also two buildings on the property. The first building is an 850-square-foot building with a garage, and is used by Defendant to house its company records and equipment. The second building is an 800-square-foot house, which is utilized by traveling nurses.

Plaintiff seeks to condemn all of the property discussed above owned by Defendant, except for the building housing the nurses. Plaintiff seeks the full and clear fee simple title to all such property, including all improvements thereof and all interest therein and right incident thereto and all rights, title and interest to the streets and all other public places, if any, upon which said real property abuts.

## B. FERC License

In November 2003, the Federal Energy Regulatory Commission ("FERC") issued Plaintiff a license to restore, expand, operate and maintain a hydroelectric plant. The approved project description provided that Plaintiff would use the Dam, and the following: "(1) [an existing] concrete powerhouse, housing thirteen generating units for a total installed capacity of 4,745-kW [kilowatt]; (2) the 2,730-foot-long, 15-foot-deep, and 80 to 200-foot-wide North Channel Head race that conveys water from the head gates to the powerhouse [the North Race]; (3) a new 210-foot-long trash rack

along the upstream side of the forebay area . . . ; and (4) appurtenant facilities." (FERC 11/28/03 Order, at 10).

FERC issued Plaintiff an original license for 50 years, and stated that such license "give[s] a licensee five years to obtain the property rights necessary for project operation. Such rights are typically obtained by contract, but where necessary may be obtained under authority of federal eminent domain." Article 5 of the license specifies that the Licensee, within five years, "shall acquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction maintenance, and operation of the project."

Defendants applied for a preliminary permit application with FERC in 2000, and FERC denied such application with prejudice. In October 2004, Defendant submitted to FERC a preliminary application to develop a second hydroelectric plant for the excess water capacity of the North Race; FERC has not ruled on the preliminary application.

## C. Inability To Obtain Necessary Rights

Based on the evidence presented at trial and the long litigation history of this case and its companion case, Case No. 00-CV-1164, it is clear to the Court and the Court so finds that Plaintiff is unable to obtain by contract or otherwise the lands or property necessary to the construction, maintenance, and operation its hydroelectric plant. Despite the fact that the Indentures

- 4 -

obligate Defendant to maintain the North Race, Defendant has consistently refused to do so and has allowed the North Race to fall into a state of extreme disrepair. Further, Plaintiffs have made several offers to purchase the property at issue, which Defendant has rejected or ignored.

Finally, Defendant has directly violated this Court's Orders with respect to the North Race. Specifically, on June 25, 2004, Defendant notified Plaintiff that the following day it intended to open the North Race Gate to allow water to flow to determine if the raceway was operational in its present dilapidated condition. Plaintiff sought and was granted an emergency temporary restraining order (the "TRO") preventing the water flow on June 25, 2004, by emergency judge William Hibbler. In direct violation of the Order, the following day Defendant proceeded to open the Gate which allowed a large volume of water at a high velocity to be released causing damage to Plaintiff and neighboring landowner, Field Container Company's property. As a result, the Court found Defendant and its president, Lee Mueller, guilty of contempt of court. On August 12, 2004, the Court granted Plaintiff a preliminary injunction restraining Defendant from opening the North Race Gates to allow water to enter the raceway until trial.

For the foregoing reasons, pursuant to Plaintiff's FERC license and 16 U.S.C. § 814, the Court concludes that Plaintiff is entitled to take by eminent domain such portions of Defendant's

property that are necessary to the operation of its hydroelectric plant.

## D. Scope of the Taking

As discussed at length in Section II of this Memorandum opinion, Plaintiff is entitled to take such property that is necessary for the construction and operation of its plant. *See* 16 U.S.C. § 814. After examining all of the evidence and authorities relating thereto, the Court makes the following findings regarding the scope of the eminent domain taking. Hereinafter, the Court refers to all property that is properly within the scope of the eminent domain action as "Subject Property."

### 1. North and South Races

Plaintiff's proposed hydroelectric plant will necessarily utilize the North Race for its operation, and accordingly, Plaintiff is entitled to take the North Race and any canal walls associated with the North Race by eminent domain. Based on the evidence presented, the Court also concludes that the North Race and South Race, which are separated by the Gates and a berm, have an interconnectivity that is essential to the successful operation of each individual race. The Gates and berm allow water to flow from one race to another and serve as an equalizing factor. Thus, in addition to owning the North Race, the Plaintiff needs also to own the South Race to ensure that Plaintiff has the ability to repair and maintain the Gates, berm, and South Race to control

water levels. The regulation of water levels is essential for maintaining the integrity of North Race and preventing damage to surrounding areas of Marseilles. Accordingly, Plaintiff is also entitled to acquire the South Race by eminent domain, as well as all other portions of the property identified in Section I(a) herein that is adjacent to the North or South Race.

### 2. *Buildings*

As discussed, one of the two buildings on the Subject Property is used by Defendant for storage of equipment and records. The other building is used by visiting nurses. Plaintiff contends it needs the building housing Defendant's equipment for security and access, but did not provide sufficient evidence to establish that either such building is necessary for these purposes. Conversely, Defendant produced evidence that there is no fence on Defendant's property to block Plaintiff's access. The Army Corps property is secured by a fence, but Plaintiff, like Defendant, has a key to obtain access to such property. Accordingly, the Court concludes that the two buildings on the Subject Property are not necessary for the operation of Plaintiff's hydroelectric plant. Accordingly, Plaintiff is not entitled to take the two buildings owned by Defendant by eminent domain.

### E. North Race Water Capacity

The North Race if repaired has a water flow capacity of approximately 9,600 cfs. Plaintiff's hydroelectric plant will use

approximately 4,800 cfs of water flow to operate its power house after reconstructed. In the companion case, Case No. 00-CV-1164, the Court interpreted the parties' rights under the Indentures and held that Plaintiff's "rights under the Indentures include _all_ water power producible by the North Head Race in Marseilles, Illinois," except in certain specified circumstances not applicable here. (May 28, 2004 Memorandum and Order, at 24)(emphasis added). Further, Plaintiff's FERC license describes the proposed project as consisting of an existing 4,745-kilowatt plant, and issues Plaintiff a license to restore, _expand_, operate and maintain the existing plant. (FERC 11/28/03 Order, at ¶ 1)(emphasis added).

### F. Use of North Race Excess Water Capacity

Based on a preponderance of the evidence, the Court finds that Defendant's plans to form a joint venture to create a second hydroelectric plant for the claimed excess 4,800 cfs of water capacity power is too speculative to consider. No agreement has been reduced to writing, and key points, such as the capital structure and number of turbine units, have not been resolved. Further, based on FERC's prior rulings denying Defendant a license, the Court concludes and finds that it is extremely unlikely that Defendant's preliminary application for a second powerhouse using excess water capacity on the North Race will be granted. Additionally, according to the Court's previous Order, although Plaintiff is presently using only roughly half of the available

water power, Plaintiff has the right to use all of the water power in the North Race under the parties' Indentures. Accordingly, the Court concludes that any potential use for a second plant for the excess capacity of water flow in the North Race by the joint venture is entirely too speculative to be considered in valuing the North Race.

### G. North Race Repair and Maintenance Costs

After examining all of the evidence and authorities relating thereto, the Court finds that it would cost $450,000 to repair the North Race to make it operable as a source for hydroelectric power. At trial, Defendant sought to prove that the cost of repair for the North Race would be $390,000 to $400,000. Conversely, Plaintiffs sought to prove that the cost of repair would be $560,000. Based on Sherry Huber's testimony, the Court concludes that the Defendant's repair budget is deficient to account for the substantial repairs and labor costs required to make the North Race operable. Based on Steven Dorit's trial testimony, Plaintiff's repair estimate for the North Race is too high. Accordingly, the Court concludes that $450,000 is a fair and reasonable repair cost for the North Race that takes into account the parties' respective estimates.

Additionally, based upon the preponderance of the evidence presented, the Court concludes that $30,000 per year is a reasonable upkeep amount for the North Race once repaired.

Although Plaintiff sought to prove that the upkeep would be $33,500 per year, the Court concludes that Plaintiff's estimate is unreasonably high because it inflates the reserve for civil repair and itemized "miscellaneous expense" category based on the other expense is not necessary. The $33,500 figure ironically is lower than the expenses estimated by Defendant's appraiser, Stephen Albert. He concluded that the expenses would total approximately $41,000 but he allowed the cost of one full time maintenance employee at $20,000, but his expenses were based on the operation of two hydroelectric plants on the South Race.

## H. Highest and Best Use

Based on the evidence produced at trial, the Court concludes that the highest and best use of the Subject Property is industrial as a water source for hydroelectric power operations. The Court notes that such finding is consistent with the testimony presented by both parties.

## I. Special Use

The Court concludes that the Subject Property is a special use property because of its location, its particularities, and the fact that only 1.4 acres out of 13.65 acres are above water. In so holding, the Court notes that the evidence presented establishes that it would be extremely expensive (in the neighborhood of seven million dollars), difficult, and labor intensive to fill the canal and convert it to another industrial uses. However, it would be

considerably less expensive ($450,000) and less difficult to repair the Subject Property and return it to its historical use as a source of water power. Further, as evidenced by this case and the granting of the FERC license, there is a market for electricity and hydroelectric power in the vicinity of the property. One of the major benefits of hydro power as opposed to power generated by other means such as coal or gas is that the cost of hydro power is relatively constant while cost of coal and gas are subject to market pressures.

## II.  APPLICABLE LAW

16 U.S.C. Section 814 provides the basis for eminent domain by a FERC licensee, stating:

> When any licensee cannot acquire by contract or pledges . . . the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure . . . in conjunction with an improvement which in the judgment of the commission is desirable and justified in the public interest for the purpose of improving or developing a waterway . . . , it may acquire the same by the exercise of the right of eminent domain.

The Seventh Circuit has held that "the takings clause of the Fifth Amendment (made applicable to state and local governments *vis-á-vis* Fourteenth Amendment incorporation), imposes considerable limits on the exercise of the eminent-domain power. Primary among them are that the taking must be for public use and that the government [or a private party] must pay the owner just compensation, which is determined to be the property's fair market

value." *Shaikh v. City of Chicago*, 341 F.3d 627, 632 (7th Cir. 2003)(citations omitted). Under Illinois law, just compensation for a property is "equal to the fair cash market value . . . for its highest and best use. The fair cash market value . . . is the price for which the land would sell under ordinary circumstances; that is, if there were a willing seller and buyer who were under no compulsion to engage in the transaction." *Department of Natural Resources of State of Ill. v. Brauer*, 791 N.E.2d 120, 122 (Ill. App. 2003), citing *Department of Public Works & Buildings v. Oberlaender*, 247 N.E.2d 288, 892 (Ill. 1969); 735 ILCS 5/7-121 (West 2002)).

There are three primary accepted ways of estimating fair market value of property taken by eminent domain: the cost approach, income approach, and market approach (also known as the sales comparison approach). *See National City Bank of Michigan/Illinois v. Illinois Dept. of Property*, 780 N.E.2d 691, 693 (Ill. App. 2002); *State of Indiana v. Bishop*, 800 N.E.2d 918, 923-24 (In. 2003). "Under the cost approach the estimated depreciated replacement cost of improvements is added to an estimate of the land's value. The income approach involves analysis of the property in terms of its ability to generate a net annual income in dollars, which is then capitalized. Under the market data approach the particular property is compared with other similar properties

which have been sold or are listed for sale." *Chicago City Bank &
Trust Co.*, 417 N.E.2d at 800-01.

The Court should not consider the "potential income from a
potential business as an indication of a property's fair market
value." *Winooski Hydroelectric Co. v. Five Acres of Land in East
Montpelier and Berlin*, 769 F.2d 69, 83 (2nd Cir. 1985). Evidence
of "enhanced value by capitalizing the anticipated income from [an
unlicenced] project 'comes perilously close to impermissible proof
of profit attributable to a frustrated business opportunity rather
than to land itself.'" *Id.*, quoting *United States v. Grand River
Dam Authority*, 363 U.S. 229, 236 (1960). Further, the Ninth
Circuit has held that capitalization of earnings on a hypothetical
project is "not proper, since the contemplated use is too remote,
when that use requires a federal license which has not been
obtained and where the condemnor is the successful competitor for
a federal license." *Public Utility Dist. No. 1 v. City of Seattle*,
382 F.2d 666, 673 (9th Cir. 1967).

In certain cases, Illinois courts have recognized that special
use property does not have a fair market value, stating:

> In eminent domain proceedings, the fair market value of
> land may be unascertainable because it has special
> capabilities that make it useful primarily to its owner,
> who would be unable to sell it at its "real" value. For
> example, churches, school buildings, and railroad
> terminals are not generally bought and sold on the open
> market. In condemnation cases involving these "special
> use" properties, therefore, a standard of compensation
> other than fair market value may be used, such as
> replacement cost.

- 13 -

*Chicago City Bank & Trust Co. v. Ceres Terminals, Inc.*, 417 N.E.2d 798, 803 (Ill. App. 1981). *See, also, Chicago Land Clearance Com. v. Darrow*, 146 N.E.2d 1, 5 (Ill. 1957)(stating that for special use "types of property, which are in effect exceptions, the law permits a resort to any evidence available to prove value including the net income from a business conducted on the property"). In cases where the property does not have a reasonable market value, Illinois courts have sometimes adopted the income approach. *See Department of Transportation v. Bouy*, 386 N.E.2d 1163, 1166-67 (Ill. App. 1979).

### III. DISCUSSION

With these general principles in mind, the Court turns to the extent and valuation of the taking.

### A. Valuation Evidence Presented

The Court initially reviews that portion of the evidence presented that the Court finds most relevant and applicable to the valuation.

### 1. *Plaintiff's Evidence*

Plaintiff's expert witness, Michael Crowley, evaluated the Subject Property and concluded that it had a market value of $40,000. In his trial testimony, Crowley acknowledged that the Subject Property was a unique, special use property. In determining the value, Crowley first considered and rejected the cost approach because the Subject Property only has three

improvements (the North Race retaining wall, and two buildings) that provide only minimal contributory value, and the land is vacant. Crowley also considered and rejected the income capitalization approach because the Subject Property is not being used for income generating purposes at the present time due to its inoperability.

Finally, Crowley considered and utilized the market approach (or sales comparison approach), in which Crowley analyzed the sales of eight other relatively similar vacant land parcels near the Illinois River in Marseilles. One such property was located immediately south of the North Race and sold for $7,000 per acre, but no portion of the property was under water at the time of sale. Based on his analysis, Crowley concluded that the Subject Property would be worth $8,000 per acre if such land was "dry" and developable. However, because the overwhelming majority of the Subject Property was under water, Crowley found the $8,000 per acre fee inapplicable.

Crowley next considered the value of the buildings on the Subject Property. He arrived at a total value of $40,000 by attributing $12,500 value to the first building and the portion of the Subject Property on which it is situated, $25,000 to the second building and the included land, and $2,500 to one above water lot. Crowley did not evaluate the value of any water rights, and did not review any leases in connection with the Subject Property. Crowley

found that the land in the canal had no value in its present state. He further concluded that any market value of the Subject Property would be exceeded by the cost to fill the canal for other industrial purposes or to repair the canal to make it operable as a water source.

Plaintiff's witness William Pickrell, based upon his experience in operating thirty-five other hydro electric facilities, testified on the repair and maintenance costs for the North Race. Using the 12% capitalization rate provided by one of Defendant's appraisers, David C. Moody, Pickrell testified that the North Race has a negative net value because the extensive repairs required to make it operable and its maintenance costs exceed the potential income.

Plaintiff's Exhibit 21, about which both Pickrell and Plaintiff's President William Harris testified, illustrates that the Subject Property, at best scenario, has a *negative* net value of $202,000. Such calculation is based upon the following figures: 76,500 in rental value, maintenance costs of $35,000, capitalization rate of 12%, and repair costs of $560,000.

## 2. *Defendant's Evidence*

Defendant's first witness, Lee Mueller, its President, testified regarding Defendant's sources of income. Defendant has an existing lease with International Paper for the water power rights in the South Race until 2010. According to Mueller's trial

testimony, International Paper owes $47,000 of the total payments due under the lease in arrears, with $24,000 in future lease payments due over the next six years. Accordingly, the Court concludes that the yearly rent under such lease is $4,000.

Additionally, under the Indentures between Plaintiff and Defendant, if Defendant maintains and repairs the North Race so it is operable, Plaintiff is obligated to pay Defendant an expected $76,500 per year for the water power rights of the North Race. The term of the Indenture is approximately 86 more years.

Defendants called an appraiser, David Moody, to evaluate the water rights. Moody evaluated the water rights in two parts: (1) the 4800 cfs to be used by Plaintiff under its FERC license (the "Licensed Portion"), and (2) the alleged 4800 cfs remaining. However, in differentiating between the two portions, Moody did not consider Plaintiff's rights to 100% of the water under the Indentures and did not utilize the income approach in evaluating the property. Instead, Moody compared the cost savings through utilization of hydro power with the next cheapest fuel to create electricity: gas through a gas fired combustion turbine, and determined that Licensed Portion had a value of $4,368,129, apparently because it would cost this much more for Plaintiff to use gas rather than water. However Moody inexplicably valued the so-called unlicenced portion of the raceway using an income approach which produced a value in his opinion of $801,000. When

asked his reason for evaluating the same approximate amount of water flow to be used by Plaintiff at almost 5 1/2 times the value of the water flow to be used by Defendant he stated that he had been instructed to do so by Defendant's attorneys. He fully acknowledged that it would not be economically feasible to produce electricity if the Marseilles Power plant owner had to pay his appraised price.

On motion by the Plaintiff, the Court struck Moody's testimony in its entirety because it was totally outlandish. First, the property is subject to a lease of the entire water rights at an annual rental of $76,000 based on Plaintiff's expected needs for the next 86 years, which Moody ignored. Second, he testified that the highest and best use of the property was for the production of hydro power to produce electricity. Evaluating property at a price so high that it would not allow the production of electricity makes no sense whatsoever and is directly contrary to the principle that property is to be valued at its highest and best use. The only basis for utilizing Moody's method would be if there was some basis to compel a person to produce electricity at the Marseilles site regardless of the cost. Under that limited circumstance the difference between the cost of gas and hydro would, of course, be relevant. But there is no law or reason, and Defendant suggests no such law, that says the Plaintiff must produce electricity at the Marseilles power plant. Furthermore, since Defendant is

contractually obligated to provide water power to Plaintiff, Plaintiff's contractual rights would be worth almost all of the $4,400,000.

Defendants called a second real estate appraiser, Steven Albert. Albert testified that the value of the property was $4,400,000. His report indicates that the Subject Property is a special use and special purpose property, to wit, supplying hydro power. His testimony was confusing and he seemed to be using a variety of methods to reach his evaluation. He started out using the income capitalization approach. He considered that the property was subject to a 86-year lease at a $76,000 annual rental. He determined that in his opinion the annual costs associated with the maintaining and operating the raceway was approximately $41,000. Next, he doubled the income to $152,000 due to the alleged excess capacity of the raceway. He deducted the expenses from the income to arrive at net income and capitalized the net income by 4% to 6% which resulted in valuations between $1,800,000 and $2,200,000. From this he deducted the estimated cost of repairs to the raceway which he assumed to be $400,000 and arrived at an evaluation of between $1,400,000 and $1,800,000. This was all fairly straight forward. However, to the appraised amount derived by using the income capitalization approach, he added a sum of money based on the fact that an alternative source of power, e.g., gas, would cost a lot more than hydro power. He concluded

that a gas fired power plant would be cheaper to build but much more costly to run and he apparently evaluated the difference to be approximately $3 million which he added to his appraised amount. Thus he concluded the appraised value of the proposed taking was $4,400,000.

Plaintiff did not make a motion to strike Albert's opinions. However, his final evaluation has similar flaws to Moody's. First, although Albert utilized the income method, he failed to consider that Defendant is obligated to furnish 100% of the North Race water rights to Plaintiff under the Indentures as previously discussed. Therefore, there is no basis for increasing the rent above the maximum Plaintiff would be required to pay. Second, he added three million dollars for the cost of a gas fired alternative, without explanation.

## B.  Court's Analysis

The Subject Property is special use property.  The great majority of the property is either under water or in disrepair and dewatered.  Due to the property's unique characteristics and location, there are no direct market comparisons and the Court finds that the market approach cannot appropriately determine the fair market value based on the particular facts present here. Similarly, the Court finds the cost approach inapplicable here because, as discussed by experts Crowley and Albert, minimal improvements would not provide much value and the cost to fill the

property is uneconomical.  The Court has held that Plaintiff cannot acquire by eminent domain the two buildings, and the wall is in total disrepair.   Here, the existing Indentures provide for payments from Plaintiff to Defendant for the water rights in the North Race.   Defendants also have a lease agreement with International Paper for the South Race that provides for payments for the water rights.  Thus, both Races have reliable lease payment histories that are not speculative.  Accordingly, the Court finds the income approach is most applicable here.

The income approach estimates the present value of the income stream. According to Crowley's expert report, "the Appraiser must arrive at an estimate of net income and capitalize this amount at a market rate.   The Appraiser will consider the quality, quality and durability of the income stream and derive estimates of the income, expenses and capitalization rates form the market to result in an indication of value."   (Crowley Report, at 41).   The Court therefore considers the Indenture obligations that Defendant presently has in connection with the Races, which require the Defendant to supply Plaintiff with 100% of the water power for the next 86 years.   As previously discussed, plans by Defendant to develop a second hydroelectric plant to utilize the excess water capacity from the North Race are extraordinarily speculative and Defendant has no rights under the Indentures to the excess water capacity.   FERC  has  not  approved  Defendant's  preliminary

application.  FERC has already granted Plaintiff a 50-year original
license for a hydroelectric plant using the water power in the
North Race.  Plaintiff need not compete for the rights applied for
by Defendant because the FERC license already grants it the right
to develop and expand its hydroelectric plant.  Further, the joint
venture agreement has not been signed and there are still open key
issues.  Accordingly, the Court does not enhance the value of the
property by applying the income approach to hypothetical earnings
from the proposed second hydroelectric plant because it is too
speculative and too remote and would be evidence of frustrated
business opportunity rather than the value of the land and water
rights themselves.  *See Grand River Dam Authority*, 363 U.S. at 236;
*Winooski Hydroelectric Co.*, 769 F.2d at 83; *Public Utility Dist.
No. 1*, 382 F.2d at 673.  Moreover, the Indenture obligations will
require Defendant to purchase the excess water rights from
Plaintiff.

After examining all of the evidence and authorities relating
thereto, the Court concludes that the total valuation of the
condemnation is $231,250.  The Court valued the Subject Property in
the following way.

### 1.  *North Race*

The value of the property in and surrounding the North Race
and all water rights associated thereto is **$131,250,** derived as
follows:

**a) Rental Amount Per Year: $76,500.** Although the minimum rental amount under the Indentures is $41,500 per year, the Court affords Defendant the benefit of doubt that the rental rate due with an operable North Race would be the expected higher yearly rental rate.

**b) Upkeep/Maintenance of North Race: $30,000.** As discussed more thoroughly in I(G) *supra*, the Court has found that $30,000 per year is a reasonable sum that takes into account labor costs, property taxes, mowing and trimming costs, gate maintenance and certification, and civil repairs reserve.

**c) Net Value: $46,500.** The net value is derived by subtracting the upkeep/maintenance from the rental rate [$76,500 - $30,000].

**d) Capitalization Rate: 8%.** The Plaintiff did not provide a capitalization rate of its own, but instead relied on the 12% capitalization rate provided by one of Defendant's appraisers. However, based on the preponderance of the evidence presented, the Court concludes that 8% is a more reasonable capitalization rate because the long-term contractual undertaking is a reasonably safe investment.

**e) Net Value divided by Capitalization Rate: $581,25.** [$46,500 divided by 8%].

**f) Subtract North Race Repair Costs: $450,000.** [$581,250 - $450,000].

**g) Total Value: $131,250.**

## 2. *South Race*

The Court notes that besides Mueller's testimony regarding the International Paper lease, Defendant did not present evidence regarding the value of any land or water rights specific to the South Race. Further, there was not relevant testimony regarding the repair costs or the upkeep and maintenance fees for the South Race. Accordingly, based on the preponderance of the evidence presented, the Court concludes that the value of the property in and surrounding the South Race and all water rights associated thereto is **$37,500**, derived as follows:

**a) Rental Amount Per Year: $4,000.**

**b) Upkeep/Maintenance of North Race: $1,000.** Although the parties did not specifically discuss the upkeep costs for the South Race, the Court concludes that $1,000 per month is a fair and reasonable upkeep cost for such Race which generates considerably less income and presumably water power than the North Race.

**c) Net Value: $3,000.** The net value is derived by subtracting the upkeep/maintenance from the rental rate [$4,000 - $1,000].

**d) Capitalization Rate: 8%.**

**e) Net Value Divided by Capitalization Rate: $37,500.** [$3,000 divided by 8%].

**f) Repair Costs:   0.**   The parties did not present evidence regarding the costs of repairs for the South Race.  It has not been dewatered and is presumably providing water power to date. Accordingly, the Court affords the Defendant the benefit of doubt that no repair costs exist on the South Race.

**g) Total Value:  $37,500.**

### 3.   *Valuation of Taking*.

The Court concludes that the fair market value of the condemnation is **$168,750**.  The Court believes that such value, which is calculated by adding the individual values of the Races, is fair and reasonable to Defendant.

### IV.   <u>CONCLUSION</u>

For the reasons stated herein, the Court concludes that Plaintiff is entitled to take by eminent domain the Subject Property of Defendant as articulated in Section I(D) above. Defendants retain ownership of the two buildings situated on the Subject Property.  Plaintiff shall pay Defendant just compensation for the taking in the amount of $168,750.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated:  December 10, 2004

- 25 -